IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EVELYN HOLMAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| UNIVERSITY OF DELAWARE, et al., | : | NO. 09-772 |
| Defendants. | : | |

Baylson, J.                                                                                   April 19, 2011

## MEMORANDUM ON SUMMARY JUDGMENT

Plaintiff Evelyn Holman ("Holman") filed a negligence claim against Defendant University of Delaware ("Delaware") for injuries she suffered when she tripped over an outstretched electrical cord and fell in the kitchen of one of Delaware's buildings. (Am. Compl., ECF No. 35 ¶ 11.) Presently before the Court is Delaware's Motion for Summary Judgment. (Summ. J. Mot., ECF No. 52.) After oral argument on Delaware's Motion and careful consideration of the record, and for the reasons that follow, Delaware's Motion will be **granted**.

### I. Factual and Procedural Background

#### A. Factual Background

On January 24, 2008, Holman allegedly tripped over an electrical cord and fell, sustaining physical injuries. The incident occurred in the kitchen of the Goodstay Center on Delaware's Wilmington campus. (Holman Dep. at 10:5-8.[1]) Delaware contracted Aramark Educational Services, LLC ("Aramark") to provide food and catering services at the Goodstay Center.

---

[1] A full transcript of Evelyn Holman's deposition testimony appears as Exhibit C to Holman's Response to Delaware's Motion. (Summ. J. Resp., ECF No. 59.)

-1-

Aramark, in turn, contracted Holman's employer, Hospitality Staff, Inc., trading as Food Team ("Food Team"), to occasionally provide additional wait staff and utility workers. (Id. at 7:18-8:8.)

Delaware owns the Goodstay Center, the kitchen, and all of the appliances in the kitchen, including the hot boxes.[2] (Carroll Dep. at 25:1-5, 33:11-14, 41:7-9[3]; Buck Dep. at 22:17-23:8, 51:22-24.[4]) Delaware provides security for the kitchen; makes all structural repairs; performs all maintenance in the kitchen; has final approval for repairs in excess of $1,000; approves and purchases equipment; has final approval for supply purchases in excess of $5,000; and has exclusive authority to renovate the kitchen and re-locate fixtures, such as refrigerators. (Carroll Dep. at 32:11-34:23; Buck Dep. at 23:9-24:18, 80:9-14.) Delaware's Conference Services operates the Goodstay Center and Margot Carroll, the Associate Vice President for Auxiliary Services (Carroll Dep. at 14:8-10), oversees Conference Services. Delaware also employs a site manager at the Goodstay location, but she is not responsible for day-to-day operations. (Id. at

---

[2] Holman alleges that she tripped over the electrical cord for a "hot box," which was stretched across the kitchen floor. (Am. Compl. ¶ 11.) Hot boxes are portable catering units used to heat and transport food to catered events. (Buck Dep. at 24:19-26:7.) The boxes have electrical cords which can be plugged in to preheat them. (Id. at 28:17-23, 52:1-11.) Aramark employees load food into the hot boxes and either wheel them to the event site or transport them by vehicle. (Id. at 29:1-7, 50:1-16.) On some occasions, wait staff employed by Food Team move the hot boxes. (Id. at 51:8-12.) The boxes are usually stored in the Goodstay Center, but not in the kitchen. (Id. at 30:13-21.) When they are in the kitchen, they are usually kept by the food preparation window. (Id. at 29:12-30:12, 61:12-18.) Aramark is free to move the hot boxes during its operations without Delaware's permission. (Id. at 80:9-14.)

[3] A full transcript of Margot Carroll's deposition testimony appears as Exhibit A to Holman's Response.

[4] A full transcript of Michael Buck's deposition testimony appears as Exhibit B to Holman's Response.

39:3-16, 44:14-17.) Otherwise, Delaware has no employees in the kitchen. (Id. at 41:24-42:2; Buck Dep. at 31:2-5.) Both Aramark and Delaware's public safety department have keys to the kitchen. (Carroll Dep. at 42:18-19.)

Delaware holds regular meetings with Aramark officials to discuss a variety of issues. In particular, Carroll meets with Sue Bogan, Aramark's director of dining services, every other week to discuss issues such as new initiatives, service efficiency, service quality, service speed,[5] and complaints. (Id. at 16:12-24, 18:3-21:11.) In addition, an Aramark official meets with Delaware's executive vice president annually to discuss such issues as food quality, speed of delivery, and offers suggestions for service improvements. (Id. at 9:6-12:1.) Delaware and Aramark do not discuss event set-up or the quality of the service staff. (Id. at 11:13-12:1.) Other than these meetings, Delaware does not supervise Aramark with regard to safety or Aramark's operations, does not clean or inspect the kitchen, does not investigate complaints about Aramark, and did not issue any policies or procedures regarding Aramark's use of the kitchen. (Id. at 29:18-24, 30:7-31:24, 35:9-37:10; Buck Dep. at 44:13-18.)

Aramark is responsible for running the day-to-day operations and managing the kitchen. (Carroll Dep. at 16:15-16, 25:6-8, 28:21; Buck Dep. at 47:5-11.) Further, Aramark supervises its own employees, is responsible for cleaning and inspecting the kitchen, orders and stores supplies, and completes daily safety audits. (Carroll Dep. at 30:12-14, 34:10-17; Buck Dep. at 37:12-24, 40:17-42:24.) These safety audits are reviewed by Aramark personnel only and are not submitted to Delaware. (Buck Dep. at 48:7-15.) Aramark does, however, report criminal activity, public

---

[5] The timeliness of delivery depends on the agenda of the particular event. (Buck Dep. at 49:19-24.)

safety issues, structural damage, and customer service issues to Delaware. (Carroll Dep. at 29:5-11.)

Aramark's catering director, Michael Buck, oversees the day-to-day operations of catering on Delaware's Wilmington campus. (Buck Dep. at 15:8-11.) Aramark is also responsible for ensuring kitchen safety during operations and provides safety tours and information to the employees of independent contractors. (Id. at 17:10-18:5, 39:13-40:12.) The company also has a written safety protocol, which it distributes to its employees but not its subcontractors. (Id. at 43:1-44:12.)

Aramark employs two full-time employees in the kitchen of the Goodstay Center. (Id. at 32:12-16.) When necessary to service an event, Aramark will re-assign employees from Delaware's Newark campus to the Goodstay Center. (Id. at 34:17-35:5.) Aramark also employs subcontractors when necessary as banquet staff and utility workers. (Id. at 35:6-14, 38:1-11.) Aramark completes the time sheets for the subcontractors' employees. (Id. at 77:21-22.)

On the day of the incident, Holman arrived at the Goodstay kitchen at approximately 7:00 a.m. (Holman Dep. at 55:17-21.) Her employer, Food Team, provided transportation. (Id. at 21:22-22:4.) Prior to January 24, she had worked in the kitchen six other days in the preceding thirty-day period. (Id. at 9:10-17.) When she arrived, she cleaned several pots and pans, checked the trash cans, and began storing supplies. (Id. at 55:24-56:13, 101:9-102:6.) She then left the kitchen at approximately 8:00 a.m. to store supplies. (Id. at 102:7-19.) When she left, the hot box and the cord she tripped over were not present. (Id. at 102:7-11.)

She returned around 10:00 a.m. to store containers of bleach under a sink. (Id. at 59:12-60:24.) At that time, the hot box was present in the kitchen, but she does not know who placed it

there. (Id. at 102:22-103:5.) Although she had seen it in the same position on earlier occasions, she had never seen it plugged in there. (Id. at 71:18-72:5, 92:11-93:20.) She acknowledged she was aware that hot boxes have electrical cords. (Id. at 96:19-21.) As she made her way to the sink, she tripped over the cord and fell. She was not carrying anything at the time and although she was looking where she was going, she was not looking at the ground as she walked. (Id. at 61:7-10, 76:20-77:2.) Holman felt her left leg get caught and she saw the cord around her foot or ankle when she looked down. (Id. at 77:13-18, 87:21-88:7.) She did not see or look to see the cord beforehand. (Id. at 100:16-19.)

## B. Procedural Background

On October 16, 2009, Holman filed her original complaint against Delaware. (Holman Compl., ECF No. 1.) She contends that Delaware was negligent for creating a defective condition – "an improperly placed electrical appliance cord stretched across an area where pedestrians walk"; failing to properly inspect, discover, and remedy the defective condition; failing to warn of the dangerous condition; and allowing the dangerous condition to exist on the premises. (Id. ¶ 13.) Delaware subsequently filed a third-party complaint against, inter alia, Aramark, (Delaware Compl., ECF No. 10), and the Court permitted Holman to amend her complaint to assert her negligence claim against Aramark, (Am. Compl., ECF No. 35). In the meantime, Delaware voluntarily dismissed with prejudice its third-party complaint against Aramark. (ECF No. 22.)

Aramark then moved for judgment on the pleadings (Mot. J., ECF No. 51) and Delaware moved for summary judgment, which Aramark joined in part (Joinder, ECF No. 54), against

Holman.[6] After the parties completed briefing on the pending motions, by letter to all counsel on November 23, 2010, the Court requested Holman's counsel to submit a brief in support of the Court's jurisdiction over this matter.

Following the parties' submissions, the Court concluded that Holman failed to carry her burden of establishing federal jurisdiction. (Memo., ECF No. 71.) The Court determined that Holman had not shown that Aramark was a diverse party. (Id.) Rather than dismiss the matter outright, the Court offered Holman the opportunity to dismiss Aramark to preserve diversity jurisdiction. (Id.) Holman availed herself of this opportunity and has dismissed Aramark. (ECF No. 73.) Because Aramark is no longer a party, the Court will dismiss its two pending Motions and its Joinder in Delaware's Motion as moot. Only Delaware's Motion for Summary Judgment awaits resolution. On April 18, 2011, the Court held oral argument on Delaware's Motion.

## II.     Jurisdiction and Legal Standard

### A.     Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). Venue is appropriate under 28 U.S.C. § 1391(a).

### B.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[7] A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

---

[6] Aramark also filed a Motion to File a Supplemental Brief, which Holman opposes. (Suppl. Mot., ECF No. 63.)

[7] Amendments to Federal Rule of Civil Procedure 56 became effective on December 1, 2010. The oft-cited summary judgment standard formerly found in Rule 56(c) is

for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion, and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56(c)(1). When the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. After the moving party has met its initial burden, the non-moving party's response must "cit[e] to particular parts of materials in the record" to support its assertion that genuine disputes of fact exist. Fed. R. Civ. P. 56(c)(1)(a). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

On a motion for summary judgment, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255. The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in the non-

---

now located in Rule 56(a), with one alteration: the substitution of the word "dispute" for "issue." Fed. R. Civ. P. 56(a). The Rules Advisory Committee explained this alteration better describes the summary judgment inquiry, but it does not affect the substantive standard or the applicability of prior decisions construing the standard. Fed. R. Civ. P. 56 advisory committee's note.
    Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order approving the amendments, the amended version of Rule 56 governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable." Accordingly, when necessary, the Court quotes the Rule's new language.

movant's favor. Id. Further, credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

## III. Discussion

### A. Parties' Contentions

Delaware argues that it is entitled to summary judgment in this matter because it did not owe Holman a duty. (Summ. J. Memo., ECF No. 53, ¶ 7.) Delaware contends that under Delaware law, landowners do not owe to the employees of independent contractors a duty to warn of hazardous conditions on their land unless the owner retains active control over the manner and method of work performance. (Id. ¶¶ 5, 7.) Delaware asserts that Aramark maintains active control over the day-to-day operations of the Goodstay Center kitchen, not Delaware. (Id. ¶¶ 7-8.) Moreover, Delaware had no employees in the kitchen and no Delaware employee placed the electrical cord on the premises during the time at issue. (Id. ¶ 8.) Delaware then argues that even if it had a duty, the electrical cord was in plain view, such that no warning was required. (Id. ¶ 9.) Finally, because the cord was in plain view and Holman did not see it, Delaware contends Holman was negligent herself, precluding recovery. (Id.)

In response, Holman argues that there exists a genuine dispute of material fact as to whether Delaware retained sufficient active control over the Goodstay Center kitchen. (Summ. J. Resp. at 4-5.) In particular, Delaware controlled the maintenance, organization, and security of the kitchen, and officials regularly met with and directed Aramark regarding how to render its services. (Id. at 6-10.) Despite this control, Delaware failed to implement any safety measures. (Id. at 5-6.) Holman identifies a lengthy list of facts which she argues raise a genuine dispute as to whether Delaware retained active control. (Id. at 6-10.) For example, Aramark reports to

Delaware regarding service issues and speed of delivery, which Holman suggests means that Delaware controls the manner of catering, including the use of hot boxes. (Id. at 8-9.) Holman concedes that Aramark is responsible for day-to-day operations and human resources issues. (Id. at 10.) Finally, she contends that even if she was partially at fault, contributory negligence is a jury issue and does not bar recovery. (Id. at 11-12.)

Delaware replies that none of its alleged areas of control indicate that it retained active control over the work in the kitchen. (Summ. J. Reply, ECF No. 61, ¶ 3.) Delaware maintains Aramark controlled daily operations. According to Delaware, Holman concedes this point. (Id. ¶ 4.) Thus, the positioning and loading of hot boxes was work controlled, supervised, and performed by Aramark's employees and contractors, not Delaware's. (Id.) Finally, Holman had a duty to maintain a proper lookout, and her admission that she was not paying attention to the ground precludes her recovery. (Id. ¶ 6.)

### B.     Legal Standards

#### 1.     Negligence and Premises Liability Generally

A federal court sitting in diversity must apply the substantive law of the forum state. Highland Ins. Co. v. Hobbs Group, LLC, 373 F.3d 347, 351 (3d Cir. 2004). Where the state's supreme court has not ruled on an issue, the court must predict how the highest court would rule on the issue. Holmes v. Kimco Realty Corp., 598 F.3d 115, 118 (3d Cir. 2010). "To that end the federal court may consider a wide range of reliable sources, including relevant state precedents, analogous decisions and reasoned dicta, as well as the policies and doctrinal trends informing and emerging from those decisions." Highland Ins. Co., 373 F.3d at 351.

To establish a claim for negligence in Delaware, Holman must establish (1) Delaware

owed her a duty of care; (2) Delaware breached that duty; and (3) Delaware's breach was the proximate cause of her injury. See Pipher v. Parsell, 930 A.2d 890, 892 (Del. 2007). The existence and parameters of a duty is a question of law, to be determined by reference to the statutes, rules, principles, and precedents which make up the law. Naidu v. Laird, 539 A.2d 1064, 1070 (Del. 1988). Disputed issues of breach, foreseeability, and proximate cause, on the other hand, involve factual determinations for the jury. Pipher, 930 A.2d at 892; Jardel Co. v. Hughes, 523 A.2d 518, 525 (Del. 1987).

Courts should begin their analysis by identifying the applicable duty under the particular circumstances of the case. DiOssi v. Maroney, 548 A.2d 1361, 1364 (Del. 1988). If no duty exists, the trial court is authorized to grant judgment as a matter of law, and the court need not consider the issues of the defendant's negligence or the plaintiff's contributory negligence. Pipher, 930 A.2d at 892; O'Connor v. Diamond State Tel. Co., 503 A.2d 661, 663 (Del. Super. Ct. 1985).

Relevant to this case, a possessor of land may be liable for physical harm caused to a business invitee by a condition on the land if the possessor knows of the condition or, if by exercise of reasonable care, he would have discovered the condition, and realizing that it involves an unreasonable risk of harm to the business invitee, fails to give him warning or take other appropriate action. Hamm v. Ramunno, 281 A.2d 601, 603 (Del. 1971). Thus, a landowner owes business invitees a duty to exercise reasonable care to protect the invitee from foreseeable dangers that he might encounter while on the premises. DiOssi, 548 A.2d at 1364. No duty exists, however, if the business invitee is equally knowledgeable of the danger. Seeney v. Dover Country Club Apartments, Inc., 318 A.2d 619, 623 (Del. Super. Ct. 1975).

## 2. Landowners' Liability to Independent Contractors

An independent contractor hired by a landowner is a business invitee while performing his or her duties. Id. at 622. Accordingly, landowners would generally owe independent contractors the duty identified above. Delaware, however, has long recognized that independent contractors present special circumstances. As such, landowners and general contractors are under no duty to protect an employee of an independent contractor from the very hazard created by the doing of the contracted work, or from the conditions of the premises or the manner in which the work is performed. See O'Connor, 503 A.2d at 663; Seeney, 318 A.2d at 621.

Nevertheless, the Delaware Supreme Court has identified two theories under which an independent contractor can nonetheless recover from a landowner for injuries suffered on the premises. The first theory – the active control doctrine – encompasses three exceptions to the no-liability rule. The second theory – the safe workplace doctrine – was recognized in the asbestos context. See In re Asbestos Litig. (Wooleyhan), 897 A.2d 767 (Del. 2006) (unpublished table decision), available at 2006 WL 1214980, at *1, 3; In re Asbestos Litig. (Helm), No. 01-11-239, 2007 WL 1651968, at *17 (Del. Super. Ct. May 31, 2007), aff'd 945 A.2d 593 (Del. 2008).

### a. Active Control Doctrine

Under the active control doctrine, the landowner is not liable to the injured employee of an independent contractor unless the owner (1) retained active control over the manner in which the work was carried out and the methods used; (2) voluntarily assumed responsibility for safety; or (3) retained possessory control over the work premises during its performance. See Handler Corp. v. Tlapechco, 901 A.2d 737, 745-46, 749 (Del. 2006); Seeney, 318 A.2d at 621.

Active control over the manner and method of work is not inferred from mere retention

by the owner of the right to inspect the work of the independent contractor or to exercise general superintendence over such work to assure complicity with the contract. O'Connor, 503 A.2d at 663; Seeney, 318 A.2d at 621. Rather, there must be some discernible control over the manner and method of the performance of the delegated tasks such that the independent contractor is not entirely free to work in his own way. Seeney, 318 A.2d at 621. Courts consider the following list of non-exhaustive factors to make this determination: the source of the tools; who has the authority to hire, fire, and discipline; who the plaintiff approaches regarding workplace concerns; who controls operations at the work site; who directs the plaintiff's work; and whether the owner is in a position of authority to provide a safe workplace. See In re Asbestos Litig. (Hudson), No. 03-06-130, 2006 WL 3872846, at *3 (Del. Super. Ct. Dec. 22, 2006).

Alternatively, a duty can be imposed on an owner who voluntarily, by agreement or otherwise, undertakes responsibility for implementing required safety measures. Handler, 901 A.2d at 746. If the owner assumes any responsibility for subcontractor safety, it has an obligation to fulfill that duty with care. Id. at 747. In Handler, the Delaware Supreme Court concluded an issue of fact existed as to whether a general contractor assumed the responsibility for subcontractor safety when it retained another subcontractor to install safety rails, provided the materials for those rails, discussed safety with its own employees, acknowledged its duty to correct unsafe conditions regarding falls or guardrails, and installed a rail two days after the plaintiff fell. Id. at 747-48.

As for the final exception, possessory control of the workplace, the landowner must exercise possessory control while the work is being performed. See id. at 749 (concluding no possessory control "while [subcontractor] completed its contractual obligations"); O'Connor, 503

A.2d at 664 (finding neither landowner nor general contractor retained possessory control over work premises "during the work").

### b. Safe Workplace Doctrine

To establish liability under the safe workplace doctrine, the plaintiff must show: (1) the defendant knew, or reasonably should have known, of a concealed, previously existing hazardous condition on the premises; (2) the defendant knew, or reasonably should have known, that the independent contractor and its employees did not know, and could not reasonably have known, of the hazard; and (3) the defendant nonetheless failed to warn or take other appropriate action. Wooleyhan, 2006 WL 1214980, at *1. This theory applies "without regard to whether th[e] hazard was the result of the activities of another independent contractor on the premises." Id. at *2. A subsequent decision described this doctrine as an extension of, rather than a departure from, Delaware premises liability law. See Helm, 2007 WL 1651968, at *17.

In extending Delaware law, the Delaware Supreme Court adopted the general standard for premises liability, but added additional layers. Most notably, the plaintiff must show a "concealed, previously existing" condition and must show that the independent contractor did not, and reasonably could not, have known of the condition. Id. at *18-19. A hazardous condition on the premises is concealed and previously existing when the owner has actual or constructive knowledge of its existence, the plaintiff and his employer do not, and the condition exists on the property before the plaintiff encounters it. Id. at *25. "Concealed" implicates the parties' knowledge, i.e. the owner is aware of the condition and the independent contractor is not. Id. at *26. This is a fact-intensive analysis that turns on the parties' knowledge at the time of the exposure, id. at *25 n.322; control has no place in the analysis, id. at *24.

To determine which theory applies, the Court must identify the source of the hazardous condition that led to the plaintiff's injury. The active control doctrine applies when the plaintiff is an employee of the independent contractor that caused the condition, i.e. the plaintiff or a co-worker caused the condition. See Wooleyhan, 2006 WL 1214980, at *3. The safe workplace doctrine applies when the employee of a different contractor caused the condition. See id. at *2.

### C. Analysis

There is one dispute of fact in this matter – whose employee placed the hot box and its electrical cord in the Goodstay Center's kitchen. Holman did not see who placed the hot box in the kitchen prior to the incident. The record indicates that Aramark's employees and Food Team's employees have permission to move the hot boxes, and Holman contends anyone could have placed the hot box in the kitchen on January 24, 2008. The answer to this question implicates which Wooleyhan doctrine governs. That is, if Aramark's employee moved the box, the safe workplace doctrine will apply because the employee of a different contractor caused the hazardous condition. Alternatively, if a Food Team employee moved the box, the active control doctrine applies because Holman's co-worker caused the hazardous condition. There is nothing in the record to suggest, and Holman's counsel could cite to nothing at oral argument, that a Delaware employee placed the hot box in the kitchen.

Although this dispute may be genuine, it is not material – under either theory, there is no genuine dispute of material fact that Delaware did not owe Holman a duty. Therefore, Delaware is entitled to summary judgment.

#### 1. Active Control Doctrine

As the employee of a subcontractor on the premises to perform her duties, Holman is a

business invitee under Delaware law. Seeney, 318 A.2d at 622. However, Delaware, as the landowner, has no duty to protect an employee of an independent contractor from the very hazard created by the doing of the contracted work, or from the conditions of the premises or the manner in which the work is performed. See O'Connor, 503 A.2d at 663; Seeney, 318 A.2d at 623. None of the exceptions to this rule apply in this case.

Holman argues that Delaware retained active control of the kitchen in the Goodstay Center for many reasons: Delaware owns the building, the kitchen, and the kitchen equipment, including the hot box; Delaware has keys to the kitchen; Delaware's public safety department provides security; Delaware exclusively provides maintenance; Delaware is responsible for structural repairs and other repairs in excess of $1,000; Delaware has final authority for renovations, fixture relocation, new equipment purchases, and supply purchases in excess of $5,000; Carroll, Delaware's employee, oversees dining services and the Goodstay Center kitchen; Aramark reports directly to Delaware regarding new initiatives, service issues, efficiency, food quality, complaints, and delivery speed at catered events; and Aramark must report criminal activity, public safety issues, structural damage, and customer service issues. (Summ. J. Resp. at 6-10.)

There is no dispute that Delaware had all the authority Holman ascribes to it. But there is also no dispute, and Holman even concedes, that Aramark was responsible for the day-to-day operations of the kitchen. (Summ. J. Resp. at 10); see also Furek v. Univ. of Del., 594 A.2d 506, 522 (Del. 1991) (noting owner can retain control in some areas and relinquish it in others). There is nothing in the record to indicate that Delaware exercised any authority over the loading and transporting of the hot boxes at issue, let alone directed Aramark's or Food Team's employees'

performance of these tasks. At oral argument, the Court inquired whether such evidence exists, and Plaintiff's counsel was only able to cite Delaware's ownership of the hot boxes. But equipment ownership is only one factor in the analysis and does not control under the circumstances of this case. See Hudson, 2006 WL 3872846, at *3.

Delaware's concerns with the timeliness of food delivery and other service issues amount to nothing more than general superintendence and efforts to ensure Aramark complies with the parties' catering services contract. See Seeney, 318 A.2d at 621-22 (concluding general contractor's presence on site, daily inspections of work, and instructions regarding when and where to perform tasks merely constituted inspection and general superintendence); see also Bryant v. Delmarva Power & Light Co., No. 89-08-070, 1995 WL 653987, at *6 (Del. Super. Ct. Oct. 2, 1995) (finding insufficient control where general contractor offered suggestions for achieving best results).

Further, Delaware courts have consistently concluded that the implementation of safety protocols, which do not exist in this case, are not even sufficient to find active control. See, e.g., Murson v. Henry Francis DuPont Winterthur Museum, Inc., No. 02-2001, 2001 WL 898590, at *1 (Del. Super. Ct. Mar. 22, 2002) (concluding safety guidelines, change orders, and regular inspections insufficient to find active control). Rather, Delaware courts have found sufficient control where the landowner directed the number of workers to be used and provided all materials, equipment, and facilities. See Figgs v. Bellevue Holding Co., 652 A.2d 1084, 1092 (Del. Super. Ct. 1994).

In this case, Delaware provided no direction whatsoever with regard to Aramark's staffing levels and Aramark was in charge of ordering and storing supplies. The remaining

alleged bases for control simply do not relate to the daily operation of the kitchen, or the manner and method by which Aramark's or its subcontractors' employees perform their duties. There is no suggestion from the record, and Holman points to nothing which would suggest, that Delaware retained discernible control over their delegated tasks. See Seeney, 318 A.2d at 621-22. Rather, it appears Aramark and its employees were free to work in their own way. See id. For these reasons, the Court concludes that Delaware did not retain sufficient active control to warrant imposition of a duty in this case.

Finally, Holman relies on Furek v. University of Delaware, 594 A.2d 506 (Del. 1991), to argue Delaware retained control. Furek, however, is distinguishable from the circumstances of this case. First, Furek dealt with the university-student relationship, which the Delaware Supreme Court noted presents special considerations. Id. at 516 ("The university-student relationship is certainly unique."). But more importantly, the Court concluded that although the University did not retain control in day-to-day activities, it did direct, restrict, and regulate the conduct which led to the plaintiff's injuries, i.e. fraternity hazing. Id. at 521-22. In this case, Delaware did not retain authority over the day-to-day operations or the conduct which led to Holman's injuries – kitchen safety and the use of hot boxes.

As for the other exceptions under this doctrine, Holman does not contend that Delaware assumed responsibility for safety or that it possessed the premises during performance of the work. Indeed, there is no dispute of fact that Delaware ceded all responsibility for safety to Aramark – Delaware did not implement any safety protocols, Delaware did not inspect the kitchen, and Aramark did not report to Delaware regarding safety issues. Compare Handler, 901 A.2d at 747-48. Further, no Delaware employees work in the kitchen and none were in the

kitchen on the day of the incident. See id. at 749; O'Connor, 503 A.2d at 664. Therefore, the Court concludes that Delaware did not voluntarily assume responsibility for safety and did not possess the premises while Aramark and Food Team were performing their work.

### 2. Safe Workplace Doctrine

Assuming an Aramark employee placed the hot box and cord in its position prior to the incident, the Court nevertheless concludes that Delaware did not owe Holman a duty. Under the safe workplace doctrine, Holman must show that Delaware was aware of, or reasonably should have been aware of, a concealed, previously existing hazardous condition, and must show that the independent contractor did not know and could not reasonably have known of the condition. See Wooleyhan, 2006 WL 1214980, at *1.

The hazardous condition in this case did not exist until sometime between 8:00 a.m. and 10:00 a.m. on the morning of the incident. When Holman left the kitchen area around 8:00 a.m., the hot box was not there. When she returned around 10:00 a.m., she tripped over the hot box's electrical cord. The issue is whether the condition was "concealed and previously existing." "Concealed" is determined by reference to the parties' knowledge – the owner's knowledge of the condition and the independent contractor's lack of knowledge. See Helm, 2007 WL 1651968, at *26. Whether a condition was previously existing presents a "perplexing question." Wooleyhan, 2006 WL 1214980, at *2.

Helm provides two examples to illustrate this element – DiOssi, 548 A.2d 1361, and Hamm, 281 A.2d 601. In DiOssi, the defendants hosted a party where alcohol was served to minors. 548 A.2d at 1362-63. The defendants also hired a valet to provide parking services. Id. at 1362. The court concluded that an intoxicated minor is a hazardous condition, which was

-18-

concealed and previously existing because the defendants were aware of the condition and its danger, and the condition was present before the plaintiff encountered the intoxicated minor. Id. at 1367; see Helm, 2007 WL 1651968, at *26. The defendants were aware because they contributed to the creation of the hazard – they knew minors were imbibing alcohol and becoming intoxicated.

In Hamm, a homeowner hired a carpenter to complete a renovation project. 281 A.2d at 602. Hamm had begun the project by removing three walls and most of the fourth of a room, but left in place a large ceiling beam. Id. The beam was attached to the ceiling only by plaster and had no support, which created a hazardous condition. Id. When the plaintiff-contractor attempted to remove the beam, it collapsed causing him injuries. Id. Although the defendant created the condition, he was unaware of its hazardous nature and, therefore, it was not concealed. Helm, 2007 WL 1651968, at *26; see Hamm, 281 A.2d at 603-04.

In this case, Holman points to no evidence in the record to show that the defective condition was "concealed." Assuming Holman was not aware of the hazard, there is no evidence that Delaware created or contributed to the creation of the hazardous condition. Holman points to nothing in the record which reasonably supports the inference that Delaware was aware, or reasonably should have been aware, of the condition. Instead, the record evidence indicates that Delaware had no presence or daily responsibility for the kitchen at all. Aramark ran the daily operations and made efforts to ensure safety. Further, at oral argument, Plaintiff's counsel could cite to nothing in the record to suggest Delaware was aware of this particular hazard, was aware of prior incidents involving the same hazard, or any Delaware employee had any involvement in creating the condition. Moreover, the condition in this case existed for a maximum of two hours.

In light of the limited time frame to discover the condition and Aramark's assumption of responsibility for safety, and because Delaware is not in the kitchen, Delaware had no reason to know of the condition. As such, the hazardous condition was not "concealed," and Delaware did not owe Holman a duty under the safe workplace doctrine.

In the absence of a legal duty, Delaware is entitled to judgment as a matter of law.

## IV. Conclusion

For the foregoing reasons, Delaware's Motion for Summary Judgment (ECF No. 52) will be **granted**. Aramark's Motion for Judgment on the Pleadings (ECF No. 51) and Motion to File a Supplemental Brief (ECF No. 63) are **denied** as moot. An appropriate Order will follow.

O:\Todd\09-772 Holman v. Univ. of Delaware (DE)\Holman - MSJ Memo - FINAL.wpd